FILED

2020 Aug-27  PM 04:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **J.C. PENNEY CORPORATION, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **1:19-cv-00560-KOB** |
| | ) | |
| **OXFORD MALL, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION

This matter comes before the court on cross-motions for summary judgment filed by Plaintiff/Counter-Defendant J.C. Penney, (doc. 59), and Defendant/Counter-Claimant Oxford Mall, (doc. 61); both motions arise from various alleged causes of action related to a lease for a retail space in a mall. In wading through the filings in this case, the court cannot help but think of a refrain often heard crooned by Don Henley on classic rock radio: "I've been trying to get down to the heart of the matter but my will gets weak and my thoughts seem to scatter [ . . .]." DON HENLEY, *The Heart of the Matter*, THE END OF INNOCENCE (Geffen Records 1989).

The song goes on to extol the virtues of forgiveness, but Henley's focus on "the heart of the matter" and getting past distractions and scattered thoughts still calls the instant case—which has little or nothing to do with forgiveness—to mind for the court. This case essentially involves two provisions of a lease contract for a J.C. Penney retail store in a mall: a provision governing options to extend the lease, and a set of provisions governing changes to the mall. In spite of that relatively limited scope, the parties bring multiple claims. In an amended complaint, J.C. Penney raises claims for (1) declaratory judgment, (2) breach of contract, (3) promissory estoppel, (4)

reformation, and (5) injunctive relief.  Oxford Mall in turn brings a counterclaim against J.C. Penney for unlawful detainer.  Beyond the distractions of multiple claims and a counterclaim, not to mention accusations of bad faith that the parties freely fling back and forth, the heart of the matter in this case coalesces around whether either party breached the lease agreement originally signed in 1968 that gave J.C. Penney the right to operate a retail store in the Quintard Mall in Oxford, Alabama under certain specified conditions.

The parties' summary judgment motions address the heart of the matter—the lease and its purported breaches—in multiple ways.  Plaintiff/Counter-Defendant J.C. Penney moves for partial summary judgment on its claim for declaratory judgment (Count I) regarding its options to extend the lease at issue, or, alternatively, on its claim for reformation of the lease to reflect J.C. Penney's remaining options to extend the lease (Count IV).  (Doc. 59).  J.C. Penney also asserts that it is entitled to summary judgment on its claim that Oxford Mall breached the lease by engaging in redevelopment activities without J.C. Penney's consent (part of Count II).  At the same time, Defendant-Counterclaimant Oxford Mall moves for summary judgment on both its counterclaim for unlawful detainer and all of J.C. Penney's claims.  (Doc. 61).  Both parties provide contrary assertions that they have abided by the operative lease while the other party breached it, seeking to support arguments that they are entitled to a judgment to that effect from this court.

After cutting through the distractions and examining the lease that forms the heart of the matter in this case, the court finds that J.C. Penney has shown entitlement to summary judgment solely on its claim for declaratory judgment regarding its options to extend the operative lease. The lease shows that J.C. Penney had five five-year options to extend, beginning in 2009.  J.C. Penney has exercised two of those options and three remain.  So, the court finds J.C. Penney

entitled to summary judgment on that claim.  The court also notes that J.C. Penney's entitlement to declaratory judgment in its favor moots J.C. Penney's equitable estoppel claim regarding the options to extend and its reformation claim.  Thus, the court will deny J.C. Penney's motion for summary judgment on its reformation claim.  Further, the court will deny summary judgment for J.C. Penney on its breach of contract claim regarding redevelopment in the mall because genuine issues of material fact remain regarding the exact nature of the redevelopment and what consent from J.C. Penney, if any, Oxford Mall obtained.

The court will also deny Oxford Mall's motion for summary judgment on its unlawful detainer claim because the lease grants J.C. Penney three more options to extend its time as a tenant at the mall, so J.C. Penney has not wrongfully occupied the premises.  Further, the court will deny Oxford Mall's motion for summary judgment on all of J.C. Penney's claims.  The court's interpretation of the contract at issue supports J.C. Penney's claims for declaratory relief, breach of contract, and injunctive relief regarding the options to extend, which forecloses Oxford Mall's arguments for summary judgment on those issues.  Additionally, the court finds J.C. Penney's equitable estoppel and reformation claims moot, which in turn moots Oxford Mall's motion for summary judgment on those claims.  Finally, as discussed above, genuine issues of material fact remain regarding Oxford Mall's redevelopment efforts, so Oxford Mall cannot show entitlement to summary judgment on J.C. Penney's breach of contract claim regarding the redevelopment.  Therefore, the court will deny in its entirety Oxford Mall's motion for summary judgment.

## I.    FACTUAL BACKGROUND

In 1968, J.C. Penney and P-K Corporation entered into a written lease agreement giving J.C. Penney the right to operate a retail department store in the Quintard Mall in Oxford,

Alabama.  The lease stated that it would run for a 20-year term from the time that J.C. Penney

occupied the premises.  The lease also provided J.C. Penney with four successive options, for

five years each, to extend the term of the lease from the date upon which the lease would

otherwise expire.  J.C. Penney began operating the retail space in 1970, so the original lease was

set to expire in 1990 with four five-year options for J.C. Penney to extend the lease.

Additionally, the lease included provisions obligating Oxford Mall to keep the mall

substantially the same except for within areas specifically reserved for expansion and

construction.  (Doc. 29-1 at 12).  The lease also stated that the mall would not be changed or

expanded, except within the designated area, without J.C. Penney's prior written consent.  (*Id.* at

27).  The lease also provided that the mall would not fence off or obstruct the parking lot and

would keep the common areas of the mall clean and in good repair as an "enclosed air-

conditioned mall."  (*Id.* at 14, 26).

Subsequently, the parties to the lease agreement amended the lease a total of nine times.

In 1984, P-K Corporation's successor-in-interest Quintard Mall, Ltd. and J.C. Penney amended

the lease in the Fifth Amendment to allow the addition of a Sears building, owned by Sears, to

the mall.  The fifth amendment to the lease explicitly stated that the Sears building still fell under

the definition of the "entire premises" of the mall, as discussed in the lease.  (Doc. 69-1-at 72).

Then, in 1985, J.C. Penney and Quintard executed the Sixth Amendment to the lease, which

extended the original lease term four years, from 1990 to 1994.  The Sixth Amendment

incorporated all four of J.C. Penney's options to extend from the previous lease.

J.C. Penney exercised its first five-year option to extend in 1994.  Then, in 1997, J.C.

Penney and Quintard entered into a new amendment to the lease, the Eighth Amendment,

because of the addition of a Dillard's store to the mall.  Of relevance here, the Eighth

Amendment granted J.C. Penney two additional successive options to extend the term of the lease from the time it would otherwise expire. The Eighth Amendment specifically stated that it gave J.C. Penney a total of six options to extend, one of which had already been exercised. So, at the time that the parties drafted the Eighth Amendment in 1997, J.C. Penney had five remaining options to extend the lease. J.C. Penney exercised its second option in 1998 and its third option in 2004.

In 2007, Quintard approached J.C. Penney seeking consent to add a Walgreen's Pharmacy to the mall premises. During negotiations, J.C. Penney requested that Quintard give it two additional options to extend its lease in exchange for consenting to the construction of the Walgreen's. Nearly a year later, in 2008, Quintard and J.C. Penney entered into the Ninth Amendment to the lease, which addressed in part the addition of the Walgreen's. The Ninth Amendment stated that the lease was set to expire on August 31, 2009; it also stated that it replaced the Eighth Amendment and gave J.C. Penney five options to extend from the date that the lease would otherwise expire. Specifically, regarding options to extend, the Ninth Amendment stated:

> Option to Extend-the text of the article of the Lease captioned "Options to Extend," as amended by the Eighth Amendment, shall be, and the same hereby is, deleted therefrom, and the following text is substituted in lieu thereof: "Tenant shall have five (5) successive options to extend the term of this lease each for a separate addition period of five (5) years from the date upon which the term would otherwise expire. Each such extension shall be upon and subject to the same terms, covenants, and conditions as those specified in this lease, except that Tenant may not exercise again any option previously exercised. If Tenant elects to exercise any of said options, it shall do so by […]

(*Id.* at 4). The Ninth Amendment also provided that, "[t]o the extent that the terms and provisions of the Lease conflict with any of the terms and provisions of this Agreement, this Agreement shall be deemed to be the controlling instrument." (*Id.* at 15).

In 2009 and 2014, J.C. Penney exercised two options to extend the lease.  In its letters to Quintard exercising the options to extend, J.C. Penney characterized those options as "the first of five (5) above-stated options to extend the term of the lease," referring to the Ninth amendment, and the "second (2nd) of the five (5) above-stated options to extend the lease," again referring to the Ninth Amendment.  (Doc. 29-6 at 4; doc. 29-7 at 3).  The record contains no indication that Quintard disagreed with that characterization.

Then, in 2017, Oxford Mall acquired the Quintard Mall property through a foreclosure sale after conducting due diligence.  In 2018, Oxford Mall sent J.C. Penney some potential redevelopment plans for review.

With the expiration of its current lease term approaching, J.C. Penney notified Oxford Mall in February of 2019 that it intended to exercise what it believed to be its third option to extend the lease.  Shortly thereafter, in March of 2019, Oxford Mall entered into a redevelopment agreement with the City of Oxford that, among other things, called for Oxford Mall to demolish the Sears building.  Three days later after entering into the agreement, Oxford Mall notified J.C. Penney that J.C. Penney had already exercised all of its options to extend as provided in the lease, asserting that J.C. Penney had a total of five options to extend that began at the end of the original lease term in 1994.

J.C. Penney then filed the instant lawsuit.  Subsequently—and allegedly without seeking J.C. Penney's consent—Oxford Mall began instituting redevelopment plans purportedly including demolishing the Sears building and obstructing parts of the common areas of the mall.  The parties dispute the exact extent and nature of the

redevelopment actions.  Prior to beginning work on the Sears building, Oxford Mall informed a J.C. Penney store manager of its intent to raze the Sears building and J.C. Penney did not object.  J.C. Penney asserts that Oxford Mall did not inform anyone who had the power to grant consent about the redevelopment plans and that J.C. Penney did not consent.

On August 31, 2019, J.C. Penney's lease, as interpreted by Oxford Mall, expired. J.C. Penney continues to attempt to make payments on the lease.

In its operative amended complaint, J.C. Penney raises five grounds for relief: declaratory judgment declaring J.C. Penney's right to extend the lease (Count I); breach of contract by Oxford Mall for refusing to allow J.C. Penney to exercise its options to extend and for changing the mall without J.C. Penney's consent (Count II); promissory estoppel seeking to hold Oxford Mall to the promise of two additional options to extend after the Eighth Amendment (Count III); reformation of the contract to comport with the parties' intentions (Count IV); and injunctive relief to enjoin Oxford Mall from interfering with J.C. Penney's rights under the lease (Count IV).  (Doc. 29).  In an amended counterclaim, Oxford Mall alleges one count of unlawful detainer under Ala. Code § 6-6-310 because J.C. Penney's rights under the lease purportedly expired and J.C. Penney failed to vacate the property.

After conducting contested discovery, both parties filed the motions for summary judgment now before the court.  J.C. Penney seeks partial summary judgment on its claims for declaratory judgment (Count I), breach of contract only as to the redevelopment (Count II), and its claim for reformation (Count IV).  (Doc. 59).  Meanwhile, Oxford Mall seeks summary judgment on its unlawful detainer claim as well as all of J.C. Penney's claims.[1]

---

[1] During the pendency of this litigation, J.C. Penney filed for bankruptcy.  But, the bankruptcy court has lifted the automatic stay, so the court can rule on the instant motions.

## II.     STANDARD OF REVIEW

Summary judgment allows a trial court to decide cases that present no genuine issues of material fact such that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. When a district court reviews a motion for summary judgment, it must determine two things: whether any genuine issues of material fact exist, and, if not, whether the moving party is entitled to judgment as a matter of law. *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof. *Id.* at 322-23.

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). But, inferences can create genuine issues of material fact. *Carlson v. FedEx Ground Package Systems, Inc.*, 787 F.3d 1313, 1318 (11th Cir. 2015).

In response, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a *genuine issue for trial.*'"  *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)) (emphasis added).

The court must "view the evidence presented through the prism of the substantive evidentiary burden" to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party.  *Anderson*, 477 U.S. at 254.  The court must refrain from weighing the evidence and making credibility determinations because these decisions belong to a jury.  *See id.* at 255.

Further, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party.  *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).  After both parties have addressed the motion for summary judgment, the court must grant the motion *only if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.

### III.    ANALYSIS

At the heart of both summary judgment motions before the court lie two issues regarding assertions of violations of J.C. Penney's lease—one involving J.C. Penney's options to renew the lease and another involving the extent of Oxford Mall's rights to renovate the mall under the lease.  While the issue involving the options to extend encompasses multiple claims and arguments from the parties, it boils down to a question of the meaning of the Ninth Amendment to the lease.  Accordingly, the court will address that issue with its multiple facets to get to the

heart of the matter, and then will address the issue of whether Oxford Mall's redevelopment efforts breached the lease.

    A.  *Options to Extend the Lease*

In its motion for summary judgment, J.C. Penney argues that the Ninth Amendment to the lease unambiguously amended the contract to give J.C. Penney two new options to extend the lease, totaling five options beginning to run in 2009.  (Doc. 66).  It asserts that the lease contains the unambiguous grant of two additional options both on its face and when read in the broader context of the development of the agreement between J.C. Penney and Oxford Mall's predecessor.  Specifically, J.C. Penney states that the lease establishes five successive options from the date that the lease would otherwise expire, and also states that the lease, as amended by the Ninth Amendment, would otherwise expire on August 31, 2009.  J.C. Penney further asserts that, in the alternative, it should be entitled to reformation of the contract to accurately reflect the intent of the contracting parties—the intent to add two extra options to extend the lease.  The reformation claim focuses at length on Oxford Mall's notice of the true intent of the contract and alleged bad faith equivocations.

In its own motion for summary judgment, Oxford Mall argues that the lease unambiguously expired on August 31, 2019; so, it asserts that not only should the court grant Oxford Mall summary judgment on J.C. Penney's for declaratory judgment, the court should grant it summary judgment on its counterclaim for unlawful detainer because J.C. Penney overstayed its lease.  (Doc. 62). Oxford Mall argues that the Ninth Amendment to the lease clearly shows that it deleted the Eighth Amendment and related back to the original lease, so J.C. Penney had five options to extend the lease starting on the termination of the original lease term (as adjusted by the Sixth Amendment) on August 31, 1994.  It argues that, because the lease is

not ambiguous, the court cannot consider extrinsic evidence.  Because it claims that the lease
provided only five extensions, Oxford Mall argues that it did not breach the lease by refusing to
allow J.C. Penney to exercise more options to extend.  Further, it argues that J.C. Penney cannot
rewrite the lease through reformation and asserts that promissory estoppel and injunctive relief
cannot provide recourse for J.C. Penney where the contract favors Oxford Mall.

   In their various responses and replies, both parties again assert—in contradiction of each
other—that the contract is unambiguous.  The parties also swap various allegations of bad faith
and unclean hands to argue why the contract should be read according to their interpretation.  At
their foundation, the arguments all hinge on the interpretation of the lease—what it says and how
the court should determine what it meant.

   In this case, J.C. Penney's declaratory judgment claim and Oxford Mall's unlawful
detainer claim mirror each other, with J.C. Penney's first breach of contract claim involving the
lease options and its arguments for equitable estoppel and reformation closely intertwined as
well.  The claims all effectively seek a directive from the court that the lease should be
interpreted and effectuated a certain way.  J.C. Penney seeks a declaration of its rights to extend
the lease or reformation of the contract to reflect those rights, while Oxford Mall seeks to refute
J.C. Penney's claims and argues unlawful detainer under Alabama law—which applies where
"one who has lawfully entered into possession of lands as tenant fails or refuses, after the
termination of the possessory interest of the tenant, to deliver possession of the premises to
anyone lawfully entitled or his or her agent or attorney."  Ala. Code § 6-6-310.  Because both
positions revolve around the interpretation of the lease, the court begins its analysis there.

   The parties agree that Alabama law governs in this case.  Further, federal courts sitting in
diversity jurisdiction, as in this case, must apply the choice of law of the state in which the court

sits. *St. Paul Fire & Marine Ins. Co. v. ERA Oxford Realty Co. Greystone, LLC*, 572 F.3d 893, 894 n.1 (11th Cir. 2009). "In determining which state's law applies in a contract dispute, Alabama follows the principle of *lex loci contractus,* applying the law of the state where the contract was formed." *Id.* Here, the parties—or their predecessors—formed the contract in Alabama. Accordingly, the court applies Alabama law. *See id.*

Under Alabama law, the court will "enforce, as it is written, an unambiguous and lawful contract." *Drummond Co., Inc. v. Walter Industries, Inc.*, 962 So. 2d 753, 780 (Ala. 2006) (citing *Ex parte University of South Alabama*, 812 So. 2d 341 (Ala. 2001)). A court should not go outside of the four corners of the instrument to interpret a contract unless the contract contains an ambiguity. *Kershaw v. Kershaw*, 848 So. 2d 942, 955 (Ala. 2002).

Generally, under Alabama contract law, the court reads the whole of the contract and, "[w]here there is no indication that the terms of the contract are used in a special or technical sense," the court will give the terms their "ordinary, plain, and natural meaning." *Homes of Legend, Inc. v. McCollough,* 776 So. 2d 741, 746 (Ala. 2000). If the court determines that the contract does not contain any ambiguous terms, "then the court will presume that the parties intended what they stated and will enforce the contract as written." *Id.*

The issue of whether a contract is ambiguous presents a question of law for the court. *Universal Underwriters Ins. Co. v. Thompson*, 776 So. 2d 81, 84 (Ala. 2000) (citing *General Aviation, Inc. v. Aerial Services, Inc.*, 700 So. 2d 1385 (Ala. Civ. App. 1997)). Courts can find a contract ambiguous where a contract provision is "capable of more than one meaning." *Voyager Life Ins. Co. v. Whitson*, 703 So. 2d 944, 948 (Ala. 1997).

In analyzing whether a term creates an ambiguity, "the court must examine more than an isolated sentence or term; [rather,] it must read each phrase in the context of all other

provisions." *Royal Ins. Co. of Am. v. Thomas*, 879 So. 2d 1144, 1154 (Ala. 2003).  The court

must read all of the provisions of the contract together and "arrive at a construction reasonably

calculated to accomplish the intent and purpose of the parties."  *Mega Life & Health Ins. Co. v.

Pieniozek*, 516 F.3d 985, 991 (11th Cir. 2008) (quoting *N. River Ins. Co. v. Jackson,* 278 Ala.

604, 179 So. 2d 731, 733 (1965)).

Here, the main issue concerns the lease's provision, as amended, regarding options to

extend.  The original lease, signed in 1968, provided for a 20-year lease term to end in August

1990, and granted J.C. Penney options to extend the lease "from the date upon which it would

otherwise expire" for four "separate additional periods of five years each."  (Doc. 29-1 at 23).

Later, through the Sixth Amendment, J.C. Penney and Quintard—the then-owner of the mall—

extended the original lease term by four years, stating that the lease would expire in 1994 instead

of 1990.  (Doc. 29-2).  The Sixth Amendment also stated that the options to extend in the

original lease would still have the same force and effect.  So, under those terms, J.C. Penney

began exercising the original options to extend provided by the lease in 1994.

Then, in 1997, J.C. Penney and Quintard entered into the Eighth Amendment, which

stated:

> Options to Extend: Landlord hereby grants Tenant an additional two (2)
> successive options to extend the term of the lease from the date upon which it
> would otherwise expire upon the same terms and conditions as those specified in
> the article of the Lease captions "Options to Extend" such that Tenant shall have a
> total of six (6) separate additional periods of five (5) years each under the Lease
> to extend the term thereof. Landlord and Tenant acknowledge that Tenant has
> exercised one such option to extend […]"

(Doc. 29-3 at 21).  The Eighth Amendment clearly stated that it was adding two new

additional options to extend to the four options originally provided in the lease.  It also

explicitly referred to the original lease and clearly specified the status of the exercise of

the previous rights to extend; J.C. Penney had used one option, so five options remained.

Subsequently, in 2008, J.C. Penney and Quintard entered into the ninth and final

amendment to the lease.  The Ninth Amendment begins by listing all of the lease documents—

including amendments and letters exercising options to extend—that preceded the amendment

and states that the lease, as supplemented and amended, will be referred to as "the Lease."  (Doc.

29-5 at 2).  It also states that the amendment contemplates the development of the Walgreen's

area at the mall.  The Ninth Amendment then states that "the Lease by its terms will expire on

August 31, 2009 unless sooner terminated or extended."  (*Id.* at 3).

As for options to extend, the Ninth Amendment states, in relevant part:

> Option to Extend-the text of the article of the Lease captioned "Options to
> Extend," as amended by the Eighth Amendment, shall be, and the same hereby is,
> deleted therefrom, and the following text is substituted in lieu thereof: "Tenant
> shall have five (5) successive options to extend the term of this lease each for a
> separate addition period of five (5) years from the date upon which the term
> would otherwise expire. Each such extension shall be upon and subject to the
> same terms, covenants, and conditions as those specified in this lease, except that
> Tenant may not exercise again any option previously exercised.  If Tenant elects
> to exercise any of said options, it shall do so by […]

(*Id.* at 4).  Finally, the Ninth Amendment states that "[t]o the extent that the terms and

provisions of the Lease conflict with any of the terms and provisions of this Agreement,

this Agreement shall be deemed to be the controlling instrument."  (*Id.* at 15).

Both parties argue that the lease, as amended by the Ninth Amendment, does not

fall prey to ambiguity.  J.C. Penney argues that the Ninth Amendment clearly gives them

five options to extend beginning in August of 2009—when the Ninth Amendment

specifically states that the lease will expire.  Oxford Mall, on the other hand, argues that

the deletion of the Eighth Amendment, the lack of any specific mention of "additional

terms," plus the mention of previously exercised options, clearly shows that the Ninth Amendment gave J.C. Penney five options to extend starting in 1994—the conclusion of the original lease term as amended by the Sixth Amendment—so J.C. Penney's options to extend have now expired. The court finds J.C. Penney's argument persuasive because of the unambiguous language of the lease when read as a complete document.

Just because the parties set forth different interpretations of the provision governing options to extend does not render the provision ambiguous. *Wayne J. Griffin Electric, Inc. v. Dunn Construction Co.*, 622 So. 2d 314, 317 (Ala. 1993) (citing *Englund's Flying Service, Inc. v. Mobile Airport Authority*, 536 So. 2d 1371 (Ala. 1988)). Here, giving the terms of the contract their ordinary and natural meaning and reading all of the terms in the contract together as a whole rather than in isolation, the court finds no ambiguity. *See Mega Life & Health Ins. Co.*, 516 F.3d at 991.

The lease contract, as amended by the Ninth Amendment, unambiguously grants J.C. Penney five five-year options to extend the lease after August 2009. The "option to extend" provision of the Ninth Amendment grants J.C. Penney five options to extend to run "from the date upon which the term would otherwise expire." (Doc. 29-5 at 4). The Ninth Amendment explicitly states that the lease was due to expire on August 31, 2009 if not terminated or extended. Accordingly, reading the option-to-extend provision in the context of the entire Ninth Amendment and replacing "the date upon which the term would otherwise expire" with August 31, 2009—the date on which the Ninth Amendment clearly and specifically states that "the Lease by its terms will expire"—the contract unambiguously provides J.C. Penney with five options to extend the lease from August 31, 2009. (Doc. 29-5 at 2, 4).

The court does not find compelling Oxford Mall's argument that the lease as amended by the Ninth Amendment unambiguously gave J.C. Penney five options to extend starting in 1994 because the Ninth Amendment replaced the original option-to-extend language in the initial lease but did not change the initial term of the lease after which the options would begin to run—the term that ended in 1994. (Doc. 62). The Ninth Amendment explicitly states that, to the extent that anything in the prior lease documents conflicts with the Ninth Amendment, the Ninth Amendment "shall be deemed the controlling instrument." (Doc. 29-5 at 15). So, just as the Ninth Amendment option-to-extend language explicitly replaces the previous language from the Eighth Amendment, the expiration date for the term of the lease as explicitly set forth in the Ninth Amendment supersedes the expiration date established in the initial lease because the Ninth Amendment controls in the event of a conflict. The court will not engage in a tortured twisting of the language of the Ninth Amendment to find that its explicit statement of when the term of the lease ends does not override the end date of the original lease.

Additionally, the court notes a few choices in the wording of the Ninth Amendment that reinforce its unambiguous meaning, especially when compared to the Eighth Amendment that it replaced. The Ninth Amendment does not mention "additional" options to extend, "total" options to extend, or "unexercised" options to extend. It certainly does not mention any number of options to extend that had been previously exercised, as the Eighth Amendment did. The provision does mention that the tenant cannot exercise previously exercised options to extend, but only in the most general terms, not in a way that appears to reference any specific previously exercised options. Further, the Ninth Amendment lists all previous amendments and exercised options to extend as documents comprising "the Lease" and then states that the Ninth Amendment, which provides five options and says that the lease expires on August 31, 2009,

controls if a conflict arises between the lease and the Ninth Amendment. *See* (Doc. 29-5 at 2, 3–4, 15). So, the Ninth Amendment replaces the previously exercised options to extend with the new grant of five options because the Ninth Amendment overrides the prior lease documents.

The amended lease document as a whole—including the specifically articulated date of expiration, the unqualified grant of five options to extend, and the explicit memorialization of the controlling nature of the Ninth Amendment—shows that a construction of the lease granting J.C. Penney five options to extend starting in 2009 presents the construction of the contract "reasonably calculated to accomplish the intent and purpose of the parties." *Mega Life & Health Ins. Co.*, 516 F.3d at 991 (quoting *N. River Ins. Co.,* 179 So. 2d at 733)). Accordingly, the court finds that the lease contract, as amended by the Ninth Amendment, unambiguously grants J.C. Penney five options to extend the lease beginning in 2009, such that three options to extend remained as of 2019.

Therefore, the court finds J.C. Penney's interpretation of the contract compelling. So, the court must examine the applicability of that interpretation to the specific claims at issue on summary judgment. First, the court addresses J.C. Penney's request for summary judgment on its declaratory judgment claim.

The Declaratory Judgment Act grants federal courts the discretion to declare the rights of parties in actual controversies. *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995). The Act provides that, "[i]n a case of actual controversy within its jurisdiction, [. . .] any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

Here, a genuine controversy exists regarding the interpretation of the lease and J.C. Penney's right to continue its tenancy at Oxford Mall. Thus, the court can grant a declaratory

judgment clarifying J.C. Penney's rights.  *See* 28 U.S.C. § 2201(a).  As discussed above, the court finds that the lease in this case unambiguously provides that J.C. Penney had five options to extend the lease for five-year terms, beginning in 2009.  J.C. Penney has exercised two of those options, so three options remained when J.C. Penney filed this lawsuit in 2019.  J.C. Penney tried to exercise one of its remaining options in early 2019, but Oxford Mall refused to honor the option.  Therefore, the court finds as a matter of law that J.C. Penney's lease has not expired and the court will GRANT summary judgment to J.C. Penney on its declaratory judgment claim and declare J.C. Penney's right to extend the lease beginning in 2019, as well as to extend the lease for two subsequent five-year terms, should it so choose.

J.C. Penney also seeks summary judgment on its claim for reformation of the lease to reflect that it still has options to extend the lease.  But, J.C. Penney pled its reformation claim as an alternative only applicable if the court found that the lease did not unambiguously grant J.C. Penney five options to extend starting in 2009.  The court's finding that the contract unambiguously support's J.C. Penney's right to extend the lease renders J.C. Penney's reformation claim moot.  Accordingly, the court will DENY summary judgment on J.C. Penney's reformation claim.  The court notes that, in addition to rendering moot J.C. Penney's reformation claim, the court's interpretation of the contract also renders moot J.C. Penney's equitable estoppel claim, which sought to hold Oxford Mall to the promise of options to extend that the court finds already memorialized in the lease.

Like J.C. Penney, Oxford Mall also seeks summary judgment related to the options to extend, both on its unlawful detainer claim and on all of J.C. Penney's claims.  The court's interpretation of the lease as unambiguously granting J.C. Penney five options to extend

beginning in 2009 resolves Oxford Mall's arguments regarding the options to extend in J.C. Penney's favor.

First, Oxford Mall cannot succeed on its motion for summary judgment on its counterclaim for unlawful detainer. Unlawful detainer under Alabama law applies when a tenant remains in possession of premises after its rights under the operative lease have expired. *See* Ala. Code § 6-6-310. Here, J.C. Penney had the right to extend the lease for five years, with two more possible extensions to follow; further, J.C. Penney attempted to exercise that right and Oxford Mall wrongfully refused to honor the option. So, J.C. Penney's rightful possessory interest in the premises has not terminated under the lease, and J.C. Penney cannot be liable for unlawful detainer. *See* 6-6-310. Accordingly, the court will DENY summary judgment for Oxford Mall's unlawful detainer claim because the claim fails as a matter of law. *See* Fed. R. Civ. P. 56.

Oxford Mall also cannot show entitlement to summary judgment on any of J.C. Penney's claims for (1) declaratory judgment, (2) breach of contract regarding the options to extend, (3) promissory estoppel, (4) reformation, or (5) injunctive relief. Oxford Mall argues that the court should grant it summary judgment on J.C. Penney's claims related to the options to extend because the lease unambiguously shows that J.C. Penney's possessory interest in the premises under the lease expired on August 31, 2019, so J.C. Penney cannot show entitlement to relief for breach of contract and cannot show entitlement to equitable relief to rewrite and enforce the contract to comport with J.C. Penney's desired terms. (Doc. 61; doc. 62). Essentially, all of Oxford Mall's arguments hinge on the correctness of its interpretation of the lease.

Because the court has found that J.C. Penney has shown entitlement to declaratory judgment and does retain options to extend the lease in this case, the court also necessarily finds

that Oxford Mall cannot show entitlement to relief as a matter of law on J.C. Penney's claims for declaratory judgment, injunctive relief, and breach of contract.  J.C. Penney's entitlement to options to extend the lease renders its claim for declaratory judgment regarding the contract meritorious and renders is claims for enforcement of the contract viable because Oxford Mall undisputedly did not honor the options to extend.  Further, this court's grant of declaratory judgment to J.C. Penney renders its claims for equitable estoppel and reformation moot, which also moots Oxford Mall's motion for summary judgment on those claims.  Therefore, the court will DENY Oxford Mall's motion for summary judgment regarding J.C. Penney's options to extend the lease because Oxford Mall cannot show entitlement to relief as a matter of law.  *See* Fed. R. Civ. P. 56.

     B.  *Redevelopment Efforts*

In its motion for summary judgment regarding Oxford Mall's redevelopment efforts, J.C. Penney argues that Oxford Mall breached the lease contract by beginning redevelopment plans that affect the mall without getting consent from J.C. Penney.  (Doc. 66).  J.C. Penney asserts that Oxford Mall plans to, and has, in fact, already begun to demolish the Sears building, demolish the corridor between Sears and J.C. Penney, fence off areas of the parking lot, wall off part of the corridor outside of J.C. Penney, and leave J.C. Penney disconnected from the enclosed, air-conditioned mall.  J.C. Penney also asserts that Oxford Mall failed to get J.C. Penney's consent, or even provide it notice, before engaging in the redevelopment, which violates the lease.

In its own motion for summary judgment, Oxford Mall argues that none of its actions after August 31, 2019 can constitute a breach of the lease because the lease had expired.  (Doc. 62).  Oxford Mall goes on to argue that razing the Sears building without consent does not

breach the lease, nor do any of its other redevelopment actions.  It also argues that, even if there was a breach, J.C. Penney has not alleged and cannot show damages.

In its response, J.C. Penney argues that even before August 31, 2019 Oxford Mall's actions changed the mall enough without its consent to constitute breach of the lease.  (Doc. 73). J.C. Penney also argues that it alleged and can recover damages related to it being cut off from the rest of the shopping center by Oxford Mall's actions.  Further, J.C. Penney argues that summary judgment would not be appropriate on the issue of damages.

Oxford Mall responds that none of the redevelopment work from before August 31, 2019—the purported end of the lease—violated the lease.  (Doc. 74).  Oxford Mall also asserts that none of the changes that it made required any consent from J.C. Penney under the lease.

Both parties filed reply briefs reasserting their positions.  (Doc. 79, doc. 80).

Under Alabama law, "to establish a breach-of-contract claim, a plaintiff must show '(1) the existence of a valid contract binding the parties in the action, (2) his own performance under the contract, (3) the defendant's nonperformance, and (4) damages." *City of Gadsden v. Harbin*, 148 So.3d 690, 696 (Ala. 2013) (quoting *S. Med. Health Sys., Inc. v. Vaughn*, 669 So.2d 98, 99 (Ala. 1995) (internal quotations omitted)).  Here, genuine issues of material fact preclude summary judgment on the issue of whether Oxford Mall's redevelopment actions constituted a breach of the contract because the extent of the redevelopment actions, and J.C. Penney's involvement, remains unclear.

The lease in this case provides explicit limitations on development that the mall could undertake without J.C. Penney's consent.  Specifically, the lease states that Oxford Mall can only change or expand the mall within a designated area without J.C. Penney's prior written consent and cannot do anything to obstruct the parking area or cause the mall to cease to operate as

enclosed and air conditioned.  (Doc. 29-1 at 14, 26–7).  The determination of whether Oxford Mall breached those provisions, as J.C. Penney alleges, relies on the exact nature of Oxford Mall's relevant redevelopment efforts and J.C. Penney's possible consent.

Here, the facts on the record do not conclusively indicate what development Oxford Mall has actually undertaken or whether J.C. Penney gave any sort of approval or consent, much less sufficient consent.  For example, J.C. Penney asserts that Oxford Mall's redevelopment efforts have included impermissible changes to the corridor outside of J.C. Penney, while Oxford Mall contends that it has not changed the corridor but merely erected a temporary barrier.  The record does not conclusively resolve that dispute.  Further, Oxford Mall indicates that it talked to J.C. Penney about its redevelopment plans in 2018 and alerted a store manager to the plans, but the record does not clearly indicate whether Oxford Mall gave notice or obtained any consent regarding the development from J.C. Penney representatives empowered to give consent to the project.

These issues of fact necessary to determining whether Oxford Mall breached the contract present matters for the jury at trial, not for the court on summary judgment.  *Celotex*, 477 U.S. at 324.  At this point in the proceedings, because of the lack of certainty regarding Oxford Mall's actions, a jury could reasonably find for either party.  *Anderson*, 477 U.S. at 254.  Accordingly, genuine issues of material fact preclude the grant of summary judgment to either party and the court will DENY both J.C. Penney and Oxford Mall's motions for summary judgment on the issue of whether Oxford Mall's redevelopment efforts breached the lease contract.  *See* Fed. R. Civ. P. 56.

## IV.     CONCLUSION

Because the court finds that the operative lease in this case grants J.C. Penney three currently-unexercised options to extend the lease, the court will **GRANT** J.C. Penney's motion for summary judgment on its declaratory judgment claim.  But, the court will **DENY** the remainder of J.C. Penney's motion for summary judgment because the declaratory judgment renders J.C. Penney's reformation claim moot, and genuine issues of material fact preclude summary judgment on J.C. Penney's claim for breach of contract regarding Oxford Mall's redevelopment efforts.

Further, the court will **DENY** Oxford Mall's motion for summary judgment in its entirety.  The court's grant of declaratory judgment to J.C. Penney forecloses or renders moot all of Oxford Mall's arguments for summary judgment regarding J.C. Penney's options to extend the lease and, as discussed regarding J.C. Penney's motion, genuine issues of material fact preclude summary judgment on J.C. Penney's breach of contract claim arising from Oxford Mall's redevelopment efforts. The court will enter a separate Order consistent with this Memorandum Opinion.

**DONE** and **ORDERED** this 27th day of August, 2020.

**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE