IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| J.C. PENNEY CORPORATION, INC., | ) ) ) |
| Plaintiff, | ) ) ) Civil Action No.: 1:19-cv-560-KOB |
| vs. | ) ) |
| OXFORD MALL, LLC | ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION

The court has before it Plaintiff J.C. Penney's motion for relief pursuant to Fed. R. Civ. P. 37 and this court's inherent powers (doc. 120) and Defendant Oxford Mall's motion for Fed. R. Civ. P. 11 sanctions (doc. 132). Both motions have been fully briefed, and the court held a hearing on the motions on July 26, 2021. For the reasons stated on the record at the hearing, the court **DENIES** Oxford Mall's motion for Rule 11 sanctions (doc. 132) and **DENIES IN PART** J.C. Penney's motion for relief (doc. 120), finding that Rule 37 sanctions against Oxford Mall are not appropriate. But, as explained further below, the court **GRANTS IN PART** J.C. Penney's motion for relief (doc. 120), finding that sanctions against Oxford Mall under the court's inherent powers are warranted because it is highly probable that Oxford Mall acted in bad faith. At the outset, the court notes that sanctions against Oxford Mall are warranted; the court specifically finds that sanctions against Oxford Mall's outside counsel are not appropriate because no evidence

even suggested that Oxford Mall shared knowledge of the lack of diversity jurisdiction with counsel when Oxford Mall learned of the diversity-destroying member.

## I. Background

On April 12, 2019, J.C. Penney brought this action pursuant to 28 U.S.C. § 1332(a)(1). (Doc. 1). On May 8, 2019, Oxford Mall filed an answer and counterclaim, also pleading diversity jurisdiction. (Doc. 9). Oxford Mall also filed a corporate disclosure statement that did not show a lack of diversity. (Doc. 12). For over two years, the parties and the court operated under the assumption that the court had subject matter jurisdiction in this case. But the court did not have subject matter jurisdiction because both J.C. Penney and Oxford Mall are citizens of Delaware.

On April 23, 2021—after the court ruled on the parties' motions for summary judgment (doc. 88) and Oxford Mall's motion for reconsideration (doc. 99); Oxford Mall got J.C. Penney to agree to waive Bankruptcy Court jurisdiction (doc. 85-1); and the parties participated in an unsuccessful mediation—Defendant Oxford Mall filed a motion to dismiss this case for lack of subject matter jurisdiction (doc. 107). In its motion to dismiss, Oxford Mall stated that while reviewing materials after the parties' March 2021 mediation, it discovered that the court lacked subject matter jurisdiction. (*Id.*). Oxford Mall submitted a chart with its motion to dismiss, showing the ownership structure of Oxford Mall, LLC. (Doc. 107-1). The chart showed that Richard Carlson, a member of Brandywine Manager, LLC—down the line in Oxford Mall's ownership structure—is a

2

citizen of Delaware. (*Id.*). Because "a limited liability company is a citizen of any state of which a member of the company is a citizen," Mr. Carlson's Delaware citizenship destroys diversity jurisdiction. *See Rolling Greens MHP, L.P. v. Comcast SCH Holdings, L.L.C.*, 374 F.3d 1020, 1022 (11th Cir. 2004) (per curiam).

On April 28, 2021, after a conference call with the parties, the court stayed proceedings in this case for 60 days to allow J.C. Penney to conduct limited discovery on the jurisdictional question and the timing related to that question. (Doc. 114). On June 8, 2021, Oxford Mall filed a supplemental corporate disclosure statement, naming Richard Carlson as a member in Oxford Mall's ownership structure. (Doc. 119). On the same date, J.C. Penney filed a motion for attorney's fees and expenses pursuant to Fed. R. Civ. P. 37 and the court's inherent powers, asserting that Oxford Mall knew about Mr. Carlson's Delaware citizenship as early as February 2020 and failed to disclose the information to both J.C. Penney and the court. (Doc. 120).

On June 16, 2021, the court dismissed this case for lack of subject matter-jurisdiction and vacated all its numerous prior orders. (Doc. 124). In so doing, the court retained jurisdiction over collateral matters in this case, as "[i]t is well established that a federal court may consider collateral issues after an action is no longer pending." *Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 395 (1990). Considering sanctions is such a collateral matter.

## II. Legal Standard

When "a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons," the court "may exercise its inherent power to assess attorney's fees." *Chambers v. Nasco, Inc.*, 501 U.S. 32, 45–46 (1991). When issuing sanctions for bad faith conduct, the court has "broad discretion to impose sanctions and the nature or amount of those sanctions." *Peer v. Lewis*, 606 F.3d 1306, 1316 (11th Cir. 2010). "The key to unlocking a court's inherent power [to sanction] is a finding of bad faith." *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998).

When issuing sanctions under inherent powers, courts in the Eleventh Circuit are required to follow the subjective bad-faith standard. *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017). Subjective bad faith is "not the same as simple recklessness, which can be a starting point but requires something more to constitute bad faith." *Id.* at 1224 (citing *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998)). When no evidence of subjective bad faith is present, the subjective bad faith standard "can be met if [a party's] conduct is *so egregious that it could only be committed in bad faith*." *Id.* (citing *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 767 (1980)) (emphasis added). "Courts considering whether to impose sanctions under their inherent power should look for disobedience and be guided by the purpose of vindicating judicial authority." *Id.* at 1225.

4

The Eleventh Circuit has not clearly specified the appropriate evidentiary standard to apply when issuing sanctions for bad-faith conduct under its inherent powers. *See Zeltser v. Little Rest Twelve, Inc.*, 662 F. App'x 887, 889 (11th Cir. 2016) (finding that "no binding precedent" existed for a party's proposition that the court "was required to support its finding of bad faith by clear and convincing evidence"). This court has previously applied the clear and convincing evidence standard "out of an abundance of caution" in a case involving bad-faith behavior and will follow the "out of an abundance of caution" approach here. *See Roche Diagnostics Corp. v. Priority Health*, No. 18-cv-1479, 2020 WL 2308319, at *4 (N.D. Ala. May 8, 2020). The clear and convincing evidence standard "falls on the spectrum between preponderance of the evidence and beyond a reasonable doubt." *Id.* (citation omitted); *see also Nejad v. AG, Ga.*, 830 F.3d 1280, 1289 (11th Cir. 2016) ("Clear and convincing evidence is a demanding but not insatiable standard, requiring proof that a claim is highly probable.").

In sum, this court will only issue sanctions for bad faith conduct under its inherent powers if it finds that it is highly probable that Oxford Mall's conduct in this case was so egregious that Oxford Mall could only have committed it in bad faith.

### III. Discussion

J.C. Penney asks the court to award it attorney's fees and expenses under the court's inherent powers for Oxford Mall's conduct in this case, which J.C. Penney argues constitutes bad faith and abused the judicial process. (Doc. 129). J.C. Penney argues that

5

(1) Oxford Mall created the misimpression that this court had diversity jurisdiction; (2) Oxford Mall has known since January 2020 that the court lacked subject matter jurisdiction and selectively disclosed and used jurisdictional information; (3) Oxford Mall's tactics caused J.C. Penney to waive Bankruptcy Court jurisdiction; and (4) Oxford Mall withheld jurisdictional information while actively litigating and mediating this case. (*Id.*).

In response, Oxford Mall argues that inherent power sanctions are not warranted because J.C. Penney did not meet its burden to invoke and prove diversity jurisdiction when it filed this case and because Oxford Mall did not act in bad faith. (Doc. 138). Oxford Mall states that it would have had every reason to tell the court if it knew before April 2021 that the court lacked subject matter jurisdiction and that J.C. Penney provided no evidence that Oxford Mall intended to deceive the court as it relates to jurisdiction. (*Id.* at 4, 29).

At the beginning of the hearing on July 26, 2021, the court noted the difficulties of establishing jurisdiction for 21st-century business entities. The court found that J.C. Penney dropped the ball when it did not follow-up with a motion to compel after Oxford Mall failed to provide the necessary information to establish diversity jurisdiction in its answer to J.C. Penney's first interrogatory and that J.C. Penney failed to meet its burden to establish diversity jurisdiction. The court found that Oxford Mall dropped the ball when it filed a counterclaim asserting diversity jurisdiction without checking to make

6

sure that jurisdiction existed. And the court stated that it dropped the ball by not taking additional steps to ensure that it had diversity jurisdiction in this case. *See, e.g., Purchasing Power*, 851 F.3d at 1220 ("It is in everyone's best interest, both the litigants' and the courts', to verify that diversity jurisdiction exists before proceeding with the case."). The court noted that it would focus the hearing on whether Oxford Mall had *actual knowledge* of the court's lack of diversity jurisdiction from January 2020 until April 2021 and whether Oxford Mall's conduct during that time period was so egregious that it constituted bad faith. The court considered the circumstances of *Hibbett Sporting Goods, Inc. v. Oxford Mall*, LLC, No. 1:19-cv-1424-CLM, the only other case Oxford Mall had pending in federal court at the time this case was being litigated; e-mail correspondence related to the *Hibbett* case the parties submitted as evidence; Oxford Mall's knowledge of the lack of subject matter jurisdiction and its conduct regarding that knowledge; and two cases that shed light on the difficulty of issuing sanctions under the court's inherent powers in circumstances involving LLCs and diversity. The court considers each of these more fully below.

   A. The <u>*Hibbett* Case</u>

      First, the court finds it useful to provide a brief overview of the *Hibbett* case. Five months after J.C. Penney filed suit against Oxford Mall, Hibbett Sporting Goods filed suit against Oxford Mall, and the case was assigned to Judge Corey L. Maze. *Hibbett Sporting Goods, Inc. v. Oxford Mall*, LLC, No. 1:19-cv-1424-CLM. The e-mails the

court recounts more fully below show that in September 2019, Oxford Mall was looking for a diversity-destroying member to divest the *Hibbett* court of jurisdiction. (Doc. 129-2 at 1–5). Oxford Mall abandoned its search until December 16, 2019, when Judge Maze *sua sponte* issued an order to show cause why the court should not dismiss the case for a lack of subject matter jurisdiction. (*Hibbett* Doc. 14). On January 16, 2020, Judge Maze held a telephone conference on the show cause order and ordered Oxford Mall to file a supplemental disclosure listing all of the members and/or partners of Oxford Mall's members and their citizenships "through every layer of members and/or partners." (*Hibbett* Doc. 19). On January 28, 2020, Oxford Mall learned about Richard Carlson—a resident of Delaware and a member of Brandywine Managers, LLC, a member down the line in Oxford Mall's ownership chain. (Doc. 129-2 at 12–14). On January 29, 2020, Oxford Mall filed a complaint against Hibbett in Richmond County, Georgia. Then on March 5, 2020, Oxford Mall filed a motion to dismiss in the *Hibbett* case for lack of subject matter jurisdiction because of Mr. Carlson's citizenship. (*Hibbett* Doc. 23). On March 19, 2020, Judge Maze dismissed the *Hibbett* case because the court lacked subject matter jurisdiction. (*Hibbett* Doc. 26).

B. The E-mails

Both parties submitted e-mail correspondence as evidence in support of their positions. The court has carefully considered the e-mail correspondence.

On September 10, 2019, Caroline Hatcher, Oxford Mall's vice president, e-mailed Isaac Pesin, a principal of Eightfold Opportunity Fund II, LP—owner of Yellowjacket Holdings, LLC, one of the members of Oxford Mall—and asked him to provide the structure and breakdown of general partners and limited partners of Eightfold Opportunity Fund II, LP, for use in the *Hibbett* case. (Doc. 129-2 at 2). On September 12, 2019, Wayne Grovenstein, general counsel for Oxford Mall, e-mailed Mr. Pesin's counsel, Barry Lapides, asking about diversity-destroying members for the *Hibbett* suit. (Doc. 129-2 at 4–5). In his e-mail, Mr. Grovenstein accurately set out the law of diversity jurisdiction, stating:

> I am trying to determine diversity jurisdiction for Oxford Mall, LLC. Diversity jurisdiction ignores the state of incorporation of a limited liability company or limited partnership but instead looks at (i) the state of residence of any individual member or partner and (ii) the state of incorporation and principal place of business of any INC. corporation.

(*Id.* at 5).

In response, Mr. Lapides told Mr. Grovenstein that all the principals of Eightfold were Florida residents but that if he needed the residences of investors, it would "take some digging." (*Id.*). Mr. Grovenstein responded that if any members were Alabama residents, the court would lack jurisdiction in *Hibbett*. (*Id.* at 4). He continued: "*Likewise for J.C. Penney*, if one or more of the members is a Texas or Delaware resident, then we may be able to relocate their lawsuit to Georgia." (*Id.* at 5) (emphasis added). These emails show that Mr. Grovenstein knew, in September 2019, what diversity jurisdiction

9

entailed and that finding a Delaware resident would destroy jurisdiction in the J.C. Penney case.

Shortly after this exchange, in the J.C. Penney case, on September 17, 2019, Oxford Mall plead federal diversity jurisdiction in its Amended Counterclaim for Unlawful Detainer. (Doc. 28).

On October 3, 2019, Mr. Lapides followed up with Mr. Grovenstein, saying that a representative of one of Eightfold's primary investors wanted to have a phone call about the "potential 'rabbit hole' concerning the disclosure." (Doc. 129-2 at 4). On October 7, 2019, Mr. Lapides followed up with Mr. Grovenstein again, asking if they needed to have a call. (*Id.*). Mr. Grovenstein responded, "Skip it." (*Id.*).

Both Ms. Hatcher and Mr. Grovenstein were closely involved with the J.C. Penney case during this time frame. For example, Ms. Hatcher verified interrogatory responses in J.C. Penney on July 18, 2019, October 30, 2019, and November 19, 2019; was deposed on August 12, 2019 and November 15, 2019; and submitted an affidavit to the court on September 30, 2019. (Doc. 129 at 11 n. 24). Likewise, Mr. Grovenstein attended six of seven depositions taken in J.C. Penney between August and November 2019. (Doc. 129 at 10 n. 22).

Then, in December 2019, Judge Maze issued an order to show cause in the *Hibbett* case and followed up by ordering Oxford Mall to file a supplemental disclosure listing all of the members and/or partners of Oxford Mall's members and their citizenships in

10

January 2020. At that time, Mr. Grovenstein again e-mailed Mr. Lapides. (Doc. 129-2 at 7–8). In a January 23, 2020, e-mail, Mr. Grovenstein wrote:

> My assumption is that the judge does not want to spend time on a diversity action for which diversity jurisdictions [sic] does not actually exist and have the proceedings vacated at some later date because diversity does not actually exist.

(Doc. 129-2 at 6). This e-mail shows that Mr. Grovenstein understood the consequences of a court's lack of diversity jurisdiction. On February 3, 2020, John Markwalter, counsel for Hull Property Group, e-mailed Mr. Grovenstein about research he conducted on a court's lacking jurisdiction and even mentioned finding an opinion from this court discussing the issues. (Doc. 129-2 at 17).

As stated above, the *Hibbett* case was dismissed in March 2020, but litigation continued in the case at hand. On April 20, 2021—after unfavorable rulings against Oxford Mall and after the parties had completed mediation—Mr. Grovenstein reached out to Kenneth Largess, counsel for Abrams Capital Management. (Doc. 138-5 at 1). Mr. Grovenstein asked Mr. Largess to confirm that the affidavit he signed about the diversity-destroying Delaware resident in the *Hibbett* case was still accurate. (*Id.*). Mr. Grovenstein wrote—furtively, in this court's opinion—that "Oxford Mall, LLC, *now* has a separate case with JCPenney involving the same type of jurisdictional claim of diversity of citizenship. We need the same type of affidavit to cause JC Penney's case in federal court to be dismissed." (*Id.*) (emphasis added). Mr. Grovenstein spoke of the present case as if

11

it were a new cause of action. But the present case had been pending since April 2019—months before *Hibbett*.

C. Oxford Mall's Knowledge

Oxford Mall tells the court that on April 19, 2021, Mr. Grovenstein told counsel, Michael Brown, that he had failed to realize that diversity jurisdiction in this case did not exist. (Doc. 138 at 16; Doc. 120-1 at Resp. to Int. No. 11). According to Oxford Mall, Mr. Grovenstein realized the jurisdictional issue after reviewing the First Amended Complaint in preparation for trial. (Doc. 138 at 16). Oxford Mall argues that "if [it] knew before April 2021 that jurisdiction did not exist, it had every reason to alert this court." (*Id.* at 4).

From its review of the e-mails discussing jurisdiction, the court finds that Mr. Grovenstein had a conscious understanding of the law as it relates to diversity jurisdiction and that he understood the consequences of a court's not having diversity jurisdiction—i.e. dismissal of the case and vacating prior rulings. Mr. Grovenstein provided an accurate summary of the law on diversity jurisdiction in his September 12, 2019 e-mail. (Doc. 129-2 at 2). Then, as of at least January 28, 2020, he had actual knowledge that one of Oxford Mall's members down-the-line destroyed diversity. Instead of alerting this court to that information at that time, Oxford Mall waited for 15 months to tell the court—after J.C. Penney agreed to the lifting of a stay in bankruptcy proceedings (doc. 85-1), after the court had ruled upon the summary judgment motions (doc. 88), after the court denied

Oxford Mall's motion for reconsideration (doc. 99), and after the parties completed mediation. *Then* Oxford Mall informed the court of its lack of jurisdiction. Oxford Mall says that it did not "make the connection" until after mediation. (Doc. 138 at 14). But it provides no evidence in support of that assertion; for example, it offers no affidavit from Mr. Grovenstein saying that he forgot or was confused. The court infers from the evidence it has—the email showing that Mr. Grovenstein knew in September 2019 what diversity jurisdiction is and that a Delaware resident would destroy diversity jurisdiction *in this case*, and Mr. Grovenstein's actual knowledge in January 2020 that Oxford Mall did, indeed, have a member who was a resident of Delaware—that Mr. Grovenstein had actual knowledge that diversity jurisdiction did not exist in this case.

Under basic agency principles, Mr. Grovenstein's knowledge is imputed to Oxford Mall. The general rule is well established that "that a principal is chargeable with and bound by the knowledge of his agent while acting within the scope of his authority." *First Ala. Bank v. First State Ins. Co., Inc.*, 899 F.2d 1045, 1061 n. 8 (11th Cir. 1990) (citing *Carnival Cruise Lines, Inc. v. Goodin*, 535 So. 2d 98, 103 (Ala. 1988)).

The court finds that clear and convincing evidence shows that Mr. Grovenstein's conduct—imputed to Oxford Mall—is tantamount to bad faith.

D. <u>Authority Guiding the Court</u>

The court does not take issuing bad-faith sanctions lightly. The court looked to two cases with somewhat analogous facts for guidance in determining whether sanctions are

13

appropriate in this case: *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218 (11th Cir. 2017) and *Atkins Nuclear Secured, LLC v. Aptim Federal Services, LLC*, No. 1:18-cv-1112, 2019 WL 179137, at *1 (E.D. Va. April 24, 2019). In *Purchasing Power*, the Eleventh Circuit reversed a district court's imposition of bad-faith sanctions in a case the district court had entertained for two years before finding out it lacked jurisdiction upon remand from the Eleventh Circuit. 851 F.3d at 1222. The defendant in that case had removed the case to federal court, had taken the word of the plaintiff that diversity jurisdiction existed, and failed to verify the jurisdiction. *Id.* The district court sanctioned the firm representing the plaintiff, finding that it "acted in bad faith when it failed to investigate adequately [plaintiff's] citizenship before it represented to [defendant] and the court that diversity jurisdiction existed." *Id.* at 1223.

The Eleventh Circuit found that the district court set out the wrong standard for issuing bad-faith sanctions; it looked only for recklessness, which "alone does not constitute conduct tantamount to bad faith." *Id.* at 1223. The Court found that "[c]ourts considering whether to impose sanctions under their inherent power should look for disobedience and be guided by the purpose of vindicating judicial authority," and that neither of those concerns were present in *Purchasing Power*. *Id.* at 1225. In its conclusion, the Eleventh Circuit noted that "[n]o party in this case acted with bad intentions, but the result was a colossal waste of time and effort." *Id.* at 1228.

This court has found *Purchasing Power* to be very instructive in this case. But, unlike the court in *Purchasing Power*, the court finds that, here, the concern of vindicating judicial authority is present and that the evidence shows that it is highly probable that Oxford Mall acted with bad intentions; its conduct was more than just reckless.

The court also reviewed *Atkins Nuclear Secured, LLC*, No. 1:18-cv-1112, 2019 WL 179137, at *1 (E.D. Va. April 24, 2019). In that case, counsel for plaintiff asked in-house counsel for defendant if any of the members of the defendant LLC were residents of certain states. *Id.* at *2. Without researching the unique challenges posed by LLCs and diversity jurisdiction, defendant's in-house counsel responded that he did not object to the court's subject-matter jurisdiction. *Id.* Just a few months later, defendant's trial counsel discovered the jurisdictional defect and advised plaintiff's counsel and the court. *Id.*

In deciding not to issue sanctions against defendant under its inherent powers, the Virginia district court explained that although defendant did not do "what would have been useful, beneficial, or even commendable," the court did not "find any evidence that either [defendant's] in-house or outside counsel actually possessed any intent to delay or disrupt the litigation in failing to investigate [defendant's] corporate citizenship sooner." *Atkins*, No. 1:18-cv-1112, 2019 WL 1793137, at *7. The Virginia district court stated that although in-house counsel's failure to conduct any investigation into the citizenship of its

15

own companies before answering an interrogatory about the citizenship gave the court "pause and concern," the court could not "assume from the record . . . that Defendant had an improper motive in responding as it did." *Id.* The court also noted that defendant was "not affirmatively representing or confirming that the [c]ourt had jurisdiction." *Id.*

Unlike the defendant in *Atkins*, Oxford Mall itself invoked diversity jurisdiction when it filed a counterclaim (doc. 9) and then an amended counterclaim (doc. 28). And, as explained above, the e-mails about the jurisdictional issue strongly suggest that Oxford Mall had an improper motive and sought to delay the litigation.

Unlike these other cases, Oxford Mall delayed at least 15 months from the time it knew about the diversity-destroying member until it notified the court of its lack of jurisdiction. And during that time, the court ruled on the parties' motions for summary judgment (doc. 88) and Oxford Mall's motion for reconsideration (doc. 99); Oxford Mall got J.C. Penney to agree to waive Bankruptcy Court jurisdiction (doc. 85-1); and the parties participated in an unsuccessful mediation. Oxford Mall's delay in disclosing lack of diversity jurisdiction caused J.C. Penney to expend unnecessary time and effort and incur unnecessary expenses—all of which could have been avoided if Oxford Mall had timely revealed the lack of diversity jurisdiction.

E. Conclusion

For the reasons discussed at both the hearing and in this memorandum opinion, the court finds that it is highly probable that Oxford Mall acted in bad faith by withholding

16

information related to the jurisdictional question from both J.C. Penney and this court. The evidence shows that Oxford Mall's general counsel understood the requirements of diversity jurisdiction, understood what was at stake if the court lacked diversity jurisdiction, knew as of January 2020 that a member down the line in Oxford Mall's ownership chain was a resident of Delaware, and failed to inform this court or J.C. Penney of that information until April 2021. Thus, the court **GRANTS IN PART** J.C. Penney's motion for relief (doc. 120) and will issue bad-faith sanctions against Oxford Mall under its inherent powers.

The court finds it appropriate for Oxford Mall to pay J.C. Penney's attorney's fees and expenses from March 5, 2020—the date that Oxford Mall filed a motion to dismiss for lack of subject matter jurisdiction in the *Hibbett* case. But before the court awards a dollar amount to J.C. Penney, the court will provide Oxford Mall an opportunity to brief the issue of the reasonableness of J.C. Penney's legal fees. The court asks J.C. Penney to submit an updated affidavit outlining its fees and expenses from March 5, 2020 to the current date on or before **August 12, 2021**. Oxford Mall must submit a brief on the reasonableness of the fees by **August 19, 2021**.

**DONE** and **ORDERED** this 5th day of August, 2021.

*/s/ Karon O. Bowdre*
_____
**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE