# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### EASTERN DIVISION

| | | |
|---|---|---|
| **J.C. PENNEY CORP., INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.** |
| | ) | **1:19-cv-00560-KOB** |
| **OXFORD MALL, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

In his reflection on the cyclical nature of time and life, T.S. Eliot wrote:
"What we call the beginning is often the end / And to make an end is to make a
beginning. The end is where we start from."[1]

This case reflects the overlap of beginnings and endings. Plaintiff J.C.
Penney filed the case invoking the court's diversity jurisdiction. The case then
proceeded in unremarkable fashion for two years—through discovery, a motion for
summary judgment, a motion for reconsideration, and mediation—until Defendant
Oxford Mall notified the court that it lacked subject matter jurisdiction over the
claims. The case then reached an abrupt end. But that end became a beginning, as
Plaintiff J.C. Penney's successor filed a new and roughly identical case in Alabama

---

[1] T.S. Eliot, *The Four Quartets*, Quartet No. 4: Little Gidding, Part V.

state court. And this case's dismissal also led to the beginning of a new round of briefing concerning the imposition of sanctions against Oxford Mall.

In August 2021, the court imposed sanctions against Oxford Mall and in favor of J.C. Penney in the amount of J.C. Penney's attorney's fees and expenses from March 5, 2020, when Oxford Mall discovered the lack of subject matter jurisdiction, until August 5, 2021, when the court decided to impose sanctions on Oxford Mall. (Doc. 140 at 17). Pursuant to that order, J.C. Penney now seeks $93,834 in attorney's fees and $558.05 in expenses for a total of $94,392.05. (Doc. 145). Oxford Mall opposes this request. (Doc. 148). The court has conducted *in-camera* review of the hourly time entries for J.C. Penney's requested fees. Oxford Mall also requested leave to file into the record two filings from the parties' ongoing litigation in state court related to the same underlying dispute as initially involved in this case. (Docs. 151, 153).

For the reasons explained below, the court will grant Oxford Mall's request to file documents into the record. The court will grant in part J.C. Penney's request and order Oxford Mall to pay the full costs and *two-thirds* of the attorney's fees that J.C. Penney requests as sanctions. With this ruling, the case before this court is finally at its end.

## BACKGROUND

The parties' cross-claims in this case rested on diversity jurisdiction. The court dismissed the case without prejudice in June 2021 after learning that both J.C. Penney and a member of one of Oxford Mall's LLC members are both citizens of Delaware. (Doc. 124). Oxford Mall fully discovered its own citizenship in January 2020, as it researched whether diversity jurisdiction existed in an unrelated federal case against Hibbett Sporting Goods, *Hibbett Sporting Goods, Inc. v. Oxford Mall, LLC*, No. 1:19-cv-1424-CLM. After discovering a Delaware citizen in its corporate fold, Oxford Mall moved to dismiss the *Hibbett* case on March 5, 2020 for lack of diversity jurisdiction. Oxford Mall moved to dismiss this case on the same grounds on April 23, 2021—over a year later. After this court granted that motion in June 2021, J.C. Penney moved for sanctions under Rule 37 and the court's "inherent powers." (Doc. 128).

After a sanctions hearing on June 26, 2021, the court found that J.C. Penney, Oxford Mall, and the court itself had "dropped the ball" in failing to discover the lack of subject matter jurisdiction earlier. (Doc. 140 at 6). But the court found it "highly probable that Oxford Mall acted in bad faith by withholding information related to the jurisdictional question from both J.C. Penney and this court" for more than one year. (*Id.* at 16–17). In other words, the court found clear and convincing evidence of Oxford Mall's bad faith in delaying notification to J.C.

Penney and this court of the jurisdictional problem. The court imposed bad-faith sanctions against Oxford Mall, finding it "appropriate for Oxford Mall to pay J.C. Penney's attorney's fees and expenses from March 5, 2020—the date that Oxford Mall filed a motion to dismiss for lack of subject matter jurisdiction in the *Hibbett* case[—]to the current date." (*Id.* at 17, published on August 5, 2021).

Shortly thereafter, J.C. Penney's successor, Penney OpCo, LLC, filed a nearly identical case in Alabama state court, *Penney OpCo LLC v. Oxford Mall, LLC*, No. 11-cv-2021-900223.00 (Ala. Cir. Ct. Calhoun Cnty.). J.C. Penney now asserts that its fee request excludes hours "devoted to the initiation and prosecution of JCPenney's lawsuit against Oxford Mall in the Circuit Court of Calhoun County, Alabama." (Doc. 145-1 at 5 n.2).

After this court awarded sanctions, J.C. Penney filed a request for its attorney's fees and costs from March 5, 2020 until August 5, 2021—the date that the court imposed sanctions. (Doc. 145). Oxford Mall responded (doc. 148), and J.C. Penney replied (doc. 150). Oxford Mall's response included an affidavit from Wayne Grovenstein—in house counsel for Hull Property Group, LLC. (Doc. 145-1). In a prior order, the court struck Grovenstein's affidavit from the record because Oxford Mall failed to submit it before the sanctions hearing in July 2021 and because it had "no relevance to the amount of fees to award—the only issue now before the court." (Doc. 149 at 2).

But that briefing was not the "end" of the sanctions issue; one day after J.C. Penney filed its reply, Oxford Mall filed a "notice" that requested leave to file into this case's record a summary judgment brief that Penney OpCo filed in the Alabama state court case against Oxford Mall. (Doc. 151). Oxford Mall argued that Penney OpCo's summary judgment filing was a "copy-and-paste" of a filing from this case that J.C. Penney's lawyers drafted sometime after March 2020. So Oxford Mall argued that J.C. Penney should not receive attorney's fees in this case for drafting filings that it presented in nearly identical form to the state court. J.C. Penney responded to Oxford Mall's notice and request. (Doc. 152).

The end still did not arrive; three months later, in December 2021, Oxford Mall again filed a "notice" requesting leave to file the state court's order granting summary judgment in Penney OpCo's favor. (Doc. 153). Again, Oxford Mall argued that this court should not award sanctions compensating J.C. Penney's counsel for developing arguments in this case on which it prevailed in the state court case. J.C. Penney again responded. (Doc. 154).

And finally, the court ordered J.C. Penney to make an *in-camera* submission of itemized hourly time entries supporting its request for attorney's fees and costs. (Doc. 155). J.C. Penney timely submitted those entries, and the court has reviewed them. So the court can fully address J.C. Penney's request.

5

## **LEGAL STANDARD**

The Supreme Court has explained that, upon a finding of a party's bad faith conduct, the court's power to impose sanctions "transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991). A court's inherent powers draw heavily on its power to do equity: "The [inherent powers] doctrine is rooted in the notion that a federal court, sitting in equity, possesses all of the common law equity tools of a Chancery Court . . . to process litigation to a just and equitable conclusion." *ITT Cmty. Dev. Corp. v. Barton*, 569 F.2d 1351, 1359 (5th Cir. 1978).[2]

Under its inherent authority, a court may issue any "reasonable and appropriate" sanction for a party's bad faith conduct. *Martin v. Automobili Lamborghini Exclusive, Inc.*, 307 F.3d 1332, 1335 (11th Cir. 2002) (citation omitted). The court possesses considerable discretion in imposing sanctions, and a "primary aspect of that discretion is the ability to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers*, 501 U.S. at 44–45. Sanctions serve the "dual purpose" of the court's inherent powers: "vindicating judicial authority" and "making the prevailing party whole for expenses caused by

---

[2] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

his opponent's obstinacy." *In re Mroz*, 65 F.3d 1567, 1575 (11th Cir. 1995) (quoting *Chambers*, 501 U.S. at 46) (alterations omitted).

Courts may only impose sanctions compensating for legal fees that share a "causal link" with the bad faith conduct: "[T]he court can shift only those attorney's fees incurred because of the misconduct at issue. Compensation for a wrong, after all, tracks the loss resulting from that wrong." *Goodyear Tire & Rubber Co. v. Haeger*, -- U.S. --, 137 S.Ct. 1178, 1186 (2017). In other words, the aggrieved party may recover "only the portion of his fees that he would not have paid but for the misconduct." *Id.* at 1187 (quoting *Fox v. Vice*, 563 U.S. 826, 836 (2011)). But courts "need not, and indeed should not, become green-eyeshade accountants" as to the proper amount of sanctions. *Fox*, 563 U.S. at 838. Instead, the court's goal is "to do rough justice, not to achieve auditing perfection," by relying on its "overall sense of a suit, and [using] estimates in calculating and allocating an attorney's time." *Id.*

## ANALYSIS

J.C. Penney seeks $93,834 in attorney's fees and $558.05 in expenses for a total of $94,392.05. (Doc. 145). Oxford Mall first argues that the court should not award J.C. Penney *any* amount as sanctions because J.C. Penney has not presented evidence of conduct "so egregious that it could only be committed in bad faith." (Doc. 148 at 4). Next, Oxford Mall argues that J.C. Penney may only recover fees

for "excess costs" that Oxford Mall's alleged bad faith caused. And based on that standard, Oxford Mall challenges four categories of costs that J.C. Penney seeks. The court will address each argument in turn.

## I.     Oxford Mall's Bad Faith

Oxford Mall first argues that the court should not award J.C. Penney *any* amount as sanctions because J.C. Penney has not presented evidence of conduct "so egregious that it could only be committed in bad faith." (Doc. 148 at 4). Oxford Mall challenges whether the court employed the correct standard in finding that Oxford Mall's bad faith was "highly probable." *See* (doc. 140 at 16). Instead, Oxford Mall argues that the court must find—and that J.C. Penney failed to present— evidence of conduct "so egregious that it could only be committed in bad faith." *See* (doc. 148 at 4) (quoting *Purchasing Power*, 851 F.3d at 1224).

This argument reflects the first of Oxford Mall's many attempts to relitigate issues that the court already decided. In its prior opinion, the court examined Oxford Mall's bad faith under the same standard that Oxford Mall now sets forth; it looked for conduct "so egregious that it could only be committed in bad faith." (Doc. 140 at 4) (quoting *Purchasing Power*). But the court explained that it examined whether bad faith was "highly probable" because that language reflects the level of proof constituting "clear and convincing evidence." (Doc. 140 at 5) (quoting *Nejad v. AG, Ga.*, 830 F.3d 1280, 1289 (11th Cir. 2016)). And the court

explained that it would look for clear and convincing evidence of bad faith "out of an abundance of caution" because the Eleventh Circuit has never clearly defined what burden of proof courts must employ when imposing sanctions under inherent powers. (Doc. 140 at 5); *see Goodyear Tire & Rubber Co.*, 137 S. Ct. at 1186 (stating that courts need not employ a "beyond reasonable doubt" standard for sanctions); *Zeltser v. Little Rest Twelve, Inc.*, 662 F. App'x 887, 889 (11th Cir. 2016) (finding that "no binding precedent" indicated that the lower court "was required to support its finding of bad faith by clear and convincing evidence"). Oxford Mall offers no case law casting doubt on that analysis; so the court stands by its analysis now.

And the court stands by its prior finding of clear and convincing evidence of Oxford Mall's bad faith. After examining the evidence and entertaining oral argument at the hearing on July 26, 2021, the court found clear and convincing evidence that Oxford Mall "acted in bad faith by withholding information related to the jurisdictional question from both J.C. Penney and this court" for more than a year after it learned of the diversity-destroying member. (Doc. 140 at 17). The only new evidence that Oxford Mall now presents to rebut the finding of bad faith is Mr. Grovenstein's affidavit, which the court has already struck. (Doc. 149). That affidavit, like Oxford Mall's argument about the evidence of bad faith, bears only on whether the court should impose sanctions *at all*—not the *amount* of fees that

J.C. Penney may recover. Oxford Mall effectively asks the court to reverse its prior finding of bad faith by submitting an untimely affidavit. But Oxford Mall may not seek such relief in a motion purportedly challenging the *amount* of sanctions the court should award. So, the court rejects Oxford Mall's argument on this point.

## II.   Oxford Mall's Challenges to J.C. Penney's Fee Submission

The parties first dispute what standard governs the sanctions the court may award J.C. Penney and whether that standard prevents J.C. Penney from recovering fees that it would have incurred if it made similar claims in a separate case. Next, Oxford Mall challenges four categories of fees for which J.C. Penney requests compensation. The court will address the appropriate legal standard; it will then address the four categories. And finally, without the benefit of reviewing J.C. Penney's specific time entries, Oxford Mall made generalized arguments against the reasonableness of J.C. Penney's fee requests. The court will address those claims last.

### A. Whether the "Excess Cost" Standard Applies to J.C. Penney's Claim

Oxford Mall argues: "In determining the 'reasonableness' of sanctions, the compensable 'costs, expenses, and attorneys' fees reasonably incurred' are 'the *excess costs* that the [party]'s *multiplication of proceedings* has added to the cost of the litigation.'" (Doc. 148 at 3, quoting *Amlong & Amlong P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1242 (11th Cir. 2007)) (emphasis added). So Oxford Mall opposes

awarding *any* fees that "would have been incurred by JCPenney regardless of the court where the case was pending" because those fees are not "excess costs." (Doc. 148 at 11).

But the standard that Oxford Mall proposes does not apply to the court's inherent power to issue sanctions. The passage that Oxford Mall quoted from *Amlong*—in piecemeal fashion—explained one of the "three essential requirements for an award of sanctions *under [28 U.S.C.] § 1927*." *See Amlong*, 500 F.3d at 1239 (emphasis added). But no binding authority provides that courts should limit their sanctions under *inherent powers* to those that would compensate for "excess costs" or "multiplied proceedings."

Unlike sanctions derived from § 1927, the court's inherent authority derives from the court's power "to process litigation to a just and equitable conclusion" and to police abuses of the judicial process. *ITT Cmty. Dev. Corp.*, 569 F.2d at 1359. The court may issue any "reasonable and appropriate" sanction under its inherent powers. *Martin*, 307 F.3d at 1335 (citation omitted). Unlike § 1927, the award of sanctions under inherent powers serves the broad "dual purpose" of those powers: both "vindicating judicial authority" and "making the prevailing party whole for expenses caused by his opponent's obstinacy." *In re Mroz*, 65 F.3d at

1575. None of this analysis hinges on whether the sanctions constitute "excess costs" for "multiplied proceedings."[3]

Admittedly, the court's inherent powers only permit it to award relief that bears a "causal link" to Oxford Mall's misconduct. *See Goodyear Tire & Rubber Co.*, 137 S. Ct. at 1186 (explaining the causal link as "a but-for test: The complaining party . . . may recover only the portion of his fees that he would not have paid but for the misconduct") (internal quotation omitted). But the court limited J.C. Penney's award to attorney's fees incurred after March 5, 2020 because the court found clear and convincing evidence that Oxford Mall knew as of March 5, 2020 that it should move to dismiss this case for lack of subject matter jurisdiction. In other words, J.C. Penney would not have litigated any matters in this case after March 2020, "but-for" Oxford Mall's bad faith. The same is true for the court's ultimately needless efforts in adjudicating the case since March 2020. *See Chambers*, 501 U.S. at 54 n.17 (finding that a court may punish "the harm done to the court itself" under inherent powers). So the court finds its award of J.C. Penney's attorney's fees from March 5, 2020 to August 5, 2021 bears a "causal link" to Oxford Mall's bad faith conduct.

---

[3] Sanctions under inherent authority and § 1927 differ in other respects; most notably, sanctions under inherent authority require a finding of subjective bad faith, while sanctions under § 1927 "tur[n] not on the attorney's subjective intent, but on the attorney's objective conduct." *Amlong*, 500 F.3d at 1239. These differences further undercut Oxford Mall's attempt to apply the § 1927 standard to sanctions under the court's inherent authority.

## B. Determining a Reasonable Fee Award

Even despite the causal link explained above, the court bears no obligation to award J.C. Penney its *full* attorney's fees for the March 2020–August 2021 period. Rather, the court has broad discretion in crafting a reasonable award that arrives at "a just and equitable conclusion" to the case. *ITT Cmty. Dev. Corp.*, 569 F.2d at 1359. That discretion flows from the equitable nature of the court's inherent powers. *See Chambers*, 501 U.S. at 46. And under that discretion, the court should aim "to do rough justice, not to achieve auditing perfection," based on its "overall sense of a suit, and [using] estimates in calculating and allocating an attorney's time." *Fox*, 563 U.S. at 838.

To that end, Oxford Mall opposes awarding attorney's fees for J.C. Penney's efforts to produce arguments that Oxford Mall argues J.C. Penney later "copy-and-pasted" in the parties' ongoing state court litigation. (Doc. 151 at 3). The court agrees that J.C. Penney's use of its arguments from this case in the state court proceeding merits some reduction in the fee award under its inherent equity power. Although J.C. Penney's request excludes hours devoted to its state court case against Oxford Mall, (*see* doc. 145-1 at 5), the court still finds that awarding the full amount of J.C. Penney's requested fees would be inequitable and would fail to achieve "rough justice" for two reasons.

First, J.C. Penney's efforts to litigate this case since March 2020 were not *entirely* wasted. For example, Oxford Mall requested leave to file into this case's record J.C. Penney's summary judgment filings in the parties' state court case. (Doc. 151). The court will GRANT that motion because assessing J.C. Penney's allegedly overlapping efforts in the state court proceeding bears on the court's equitable assessment of whether awarding the overlapping fees would *overcompensate* J.C. Penney, rather than "making it whole." *See In re Mroz*, 65 F.3d at 1575 (cleaned up).[4]

That summary judgment filing from the state court case confirms that J.C. Penney repeated arguments it presented in this case after March 2020—sometimes word-for-word—in the state case. *Compare* (doc. 95 at 20 *et seq.*, J.C. Penney's response to motion to alter in this case) *with* (doc. 151-1 at 27 *et seq.*, J.C. Penney's motion for summary judgment in state court). In other words, J.C. Penney has reaped at least some benefit from its attorney's efforts in this case since March 2020 by filing similar materials in the state case. So the court finds it would not be a "just and equitable conclusion" to this case to award *full* attorney's fees for briefing efforts that J.C. Penney duplicated in the state case. *See ITT Cmty. Dev. Corp.*, 569 F.2d at 1359.

---

[4] The court will also GRANT Oxford Mall's request to file the state court summary judgment ruling into this case's record. (Doc. 153). And that filing shows that J.C. Penney prevailed on the state court motion for summary judgment as it had done here.

And second, the court finds the full award of $93,834 in attorney's fees to exceed a reasonable amount that would "vindicat[e] judicial authority." *See In re Mroz*, 65 F.3d at 1575. The court previously found that *both* parties, including J.C. Penney, and the court itself "dropped the ball" in examining the court's jurisdiction from the case's outset. (Doc. 140 at 6). The court does not find it reasonable or equitable to award J.C. Penney its full requested fees for an issue that it bore at least some responsibility for overlooking. And J.C. Penney has spent just under $400,000 in attorney's fees over the entire case. *See* (Doc. 129 at 30). So awarding J.C. Penney nearly $94,000 in attorney's fees would compensate it for roughly one-quarter of its total attorney's fees for the case. The court finds this sum unreasonable.

For these reasons, the court finds it necessary to impose an equitable limitation on J.C. Penney's fee request that reflects the benefits J.C. Penney reaped from its efforts in this case and J.C. Penney's own responsibility for failing to discover the court's lack of jurisdiction. And the court also bears in mind that it should exercise its inherent powers "with restraint and discretion." *In re Mroz*, 65 F.3d at 1575. So the court will limit its sanction award to *two-thirds of J.C. Penney's requested fees, for a total of $62,556.00*. But the court finds reasonable J.C. Penney's requested costs of $558.05.

### C. The First Two Categories of Challenged Hours

Aside from the one-third reduction, however, the court finds no reason to further reduce J.C. Penney's requested fees.

Oxford Mall challenges four categories of J.C. Penney's time entries. Oxford Mall's challenges to two of those categories rest on the "excess costs" standard that the court rejected above: (1) fees J.C. Penney incurred when the court stayed this case for J.C. Penney's bankruptcy proceeding and (2) fees incurred when the parties underwent mediation. Oxford Mall argues: "Any fees that JCPenney incurred negotiating whether to litigate this dispute in Alabama or in federal bankruptcy court in Texas would have been incurred regardless, whether this matter remained pending in this court or in Alabama state court." (Doc. 148 at 8) (citing *Amlong*). Likewise, Oxford Mall also challenges the fees that J.C. Penney claims from December 2020 to March 2021, when the parties underwent mediation because "mediation would have occurred in this litigation, regardless of the venue." (Doc. 148 at 10).

As explained above, § 1927's "excess cost" and "multiplied proceedings" standard does not apply to sanctions under the court's inherent authority. In equity, the court may, but need not, consider what efforts J.C. Penney may have expended on the bankruptcy or mediation in a state court proceeding. *See In re Mroz*, 65 F.3d at 1575 (stating that courts may award attorney's fees "making the prevailing party

16

whole") (quotation omitted). To that end, the court has decided to award only two-thirds of J.C. Penney's requested fees in part because J.C. Penney's duplicated efforts. So the court finds Oxford Mall's argument as to these categories of hours to be moot based on the court's equitable one-third reduction.

### D. The Remaining Two Categories of Challenged Hours

Oxford Mall challenges two other categories of fees for which J.C. Penney requests compensation: (1) fees J.C. Penney incurred responding to Oxford mall's motion to vacate, alter, or amend the court's summary judgment ruling; and (2) fees J.C. Penney incurred in conducting jurisdictional discovery and drafting its motion for relief. (Doc. 148 at 8 *et seq*.). The court disagrees, and it will address each argument in turn.

### i.   Fees Incurred Responding to Oxford Mall's Motion to Vacate, Alter, or Amend

Oxford Mall challenges J.C. Penney's fees from September to October 2020, arguing that this period reflects the time when J.C. Penney briefed its response to Oxford Mall's motion to vacate, alter, or amend. Oxford Mall argues that J.C. Penney should not receive these fees because the basis of Oxford Mall's motion was "J.C. Penney's own withholding of documents," including the parties'

operative lease agreement: "Exhibit B." (Doc. 148 at 9). In other words, J.C.

Penney may not recover for a "problem of its own making." (*Id.*).[5]

The court thought it was clear when it previously rejected Oxford Mall's argument on this point. The court found that "the operative Exhibit B/site plan was in Oxford Mall's possession," and that J.C. Penney had produced and identified the operative Exhibit B no later than November 11, 2019—i.e., before the close of discovery. (Doc. 98 at 6). In other words, Oxford Mall's Motion to Alter rested on a "problem of Oxford Mall's making," rather than J.C. Penney's. The court does not appreciate Oxford Mall's attempt to relitigate that issue now, and it will award J.C. Penney's fees for responding to the Motion to Alter, subject to the one-third reduction explained above.

### ii.   Fees Incurred when J.C. Penney Conducted Limited Discovery as to Jurisdiction and Moved for Sanctions

In the final challenged category, Oxford Mall argues that J.C. Penney may not recover fees for its efforts to conduct limited discovery about diversity jurisdiction and its motion for sanctions. (Doc. 148 at 11). Oxford Mall argues, "asserting diversity jurisdiction was JCPenney's burden, not Oxford Mall's." (*Id.*).

---

[5] Oxford Mall also claims that J.C. Penney may not seek fees for briefing its response to Oxford Mall's Motion to Alter, arguing that J. C. Penney copy-and-pasted portions of that response in a filing in the state court proceeding. (Doc. 151 at 1). But the court has already addressed that argument by equitably reducing the sanctions to two-thirds of the requested fees.

Again, the court rejects Oxford Mall's attempt to relitigate who "dropped the ball" in failing to examine the court's jurisdiction sooner. *See* (Doc. 140 at 6). But as explained, the court will equitably reduce J.C. Penney's fee reduction in part because of J.C. Penney's own responsibility in failing to discover the jurisdictional defect sooner.

### E. Oxford Mall's Other Arguments Concerning Time Entries

At first, J.C. Penney only supported its attorney fee request with two affidavits and a spreadsheet. (Doc. 145-1; doc. 145-2). The first affidavit briefly describes J.C. Penney's hired counsel: partner Dave Pruet and associate Benjamin Willson of the firm Lightfoot, Franklin, & White LLC. (Doc. 145-1). The affidavit describes Pruet and Willson's litigation experience and hourly rates ($370 and $285 per hour, respectively), and the hourly rate of the assisting paralegal, Mila Hubbard ($150 per hour). J.C. Penney also provided a spreadsheet accounting for the hours underlying its fee request. (Doc. 145-1 at 5). After Oxford Mall attacked the spreadsheet for only listing the hours in monthly lump sums, the court conducted an *in-camera* review of itemized time entries.

Courts assess traditional attorney's fee requests based on a reasonableness standard. *See Blum v. Stenson*, 465 U.S. 886, 888, (1984). Courts often employ the lodestar approach, which entails "multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate." *Id.* Although J.C.

Penney requests attorney's fees under the court's inherent sanctioning power, both inherent powers and the lodestar approach turn on the reasonableness of the request. *Compare Blum*, 465 U.S. at 888 *with Martin*, 307 F.3d at 1335. So the court finds the lodestar cases helpful as it analyzes the reasonableness of J.C. Penney's request. And those cases state that reasonableness turns on factors including "the time and labor required . . . the skill requisite to perform the legal service properly . . . the amount involved and the results obtained . . . [and] the experience, reputation, and ability of the attorneys." *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974).

After reviewing the itemized time entries for J.C. Penney's attorneys, the court finds those hours reasonable—subject to the one-third limitation the court has already explained. In general, the court finds that the time entries reflect a reasonable use of time to assess the needs of the case from March 2020 onward. And the entries reasonably reflect the ebbs and flows of the case's busy periods, including J.C. Penney's efforts to respond to Oxford Mall's motion to reconsider in September and October 2020, engage in mediation beginning in January 2021, and address the jurisdictional issues that Oxford Mall raised in April 2021.

Without the benefit of seeing the time entries, Oxford Mall presented several generalized challenges to the reasonableness of J.C. Penney's attorney hours. For example, Oxford Mall questioned whether J.C. Penney's counsel improperly split

the assignment of tasks between its more- and less-experienced counsel, and whether attorneys billed time for performing "administrative, paralegal work." (Doc. 148 at 13–14). Oxford Mall also questioned whether J.C. Penney's counsel improperly "duplicated" tasks between the lawyers. (*Id.* at 13).

The court finds that J.C. Penney's *in-camera* submission undercuts each of these concerns. The court finds no evidence of "duplicated" work between J.C. Penney's Lightfoot attorneys. And the court finds that the billed entries reflect "legal work"—conferring with clients, strategizing for the case, researching case law, and drafting filings—rather than "clerical work" that a paralegal could perform. *See Johnson*, 488 F.2d at 717.

Oxford Mall also challenges the roughly $44,000 that J.C. Penney's counsel billed from May to July 2021: the period in which J.C. Penney conducted discovery about and responded to the jurisdictional issue. (Doc. 148 at 16). Oxford Mall argues that this sum of hourly fees reflects an unreasonably large amount of work because J.C. Penney merely had to propound discovery requests, review discovery responses, and file its motion for sanctions. But the court finds that J.C. Penney's time entries reflect reasonable efforts to respond to Oxford Mall's late-in-the-day revelation of the jurisdictional issue. The entries reflect a flurry of legal research concerning subject-matter jurisdiction, as well as discovery about the who, what, and when of Oxford Mall's knowledge of the issue. The entries also

21

reflect numerous phone calls and correspondence between the Lightfoot attorneys and J.C. Penney's in-house counsel, discussing the sea change that the jurisdictional issue presented and J.C. Penney's responsive strategy. And J.C. Penney drafted its own brief for sanctions and responded to Oxford Mall's brief concerning Rule 11 sanctions. Based on these extensive—yet justified—efforts, the court finds reasonable J.C. Penney's counsel's hours in this period.

Oxford Mall also challenges J.C. Penney's submission because "JCPenney appears to have spent approximately $140,000 more in fees than Oxford Mall in this matter." (Doc. 148 at 14). Even accepting that argument as true, the relevant sanctions period begins in March 2020; it does not include the entire case. Nor does the reasonableness of J.C. Penney's counsel's efforts hinge on the time that Oxford Mall's own counsel allegedly devoted to the case.

Oxford Mall also argues that it should not pay approximately $17,000 in fees that it assumes J.C. Penney must have spent on amending its complaint to include a claim for injunctive or declaratory relief. (Doc. 148 at 15). This effort, Oxford Mall argues, reflects yet another "problem of its own making" because J.C. Penney's complaint failed to request injunctive or declaratory relief sooner. (*Id.* at 16). Yet again, Oxford Mall has already raised this very argument (*see* doc. 138 at 30 n.25), and the court rejected it when it imposed sanctions. So the court rejects Oxford

Mall's opposition to the fees for the time spent allegedly amending J.C. Penney's complaint.

Finally, Oxford Mall presents the unusual argument that J.C. Penney may not "double dip" its request for fees by seeking unpaid fees that J.C. Penney no longer owes because of its bankruptcy. (Doc. 148 at 16). Oxford Mall argues that J.C. Penney "absolved all of its debts between March 5, 2020 and August 5, 2021." (*Id.* at 17). So it argues that OpCo Penney, J.C. Penney's successor, "should not be entitled to fees JCPenney incurred before OpCo assumed the Lease on December 12, 2020." (*Id.*). Like J.C. Penney, the court finds the double-dipping argument "difficult to understand, and Oxford Mall provides no authority in support of it." (Doc. 150 at 19 n.56). But J.C. Penney's reply included an affidavit from Mr. Pruet, which states that "JCPenney has now therefore paid all the $94,392.05 submitted to the Court for reimbursement." (Doc. 150-1 at 3). This evidence resolves that J.C. Penney did not absolve any debts that it owed to its counsel. So the court will award those fees as sanctions.

## CONCLUSION

For the reasons stated above, the court will equitably limit the sanctions award to two-thirds of J.C. Penney's requested fees, for a total of $62,556.00 in attorney's fees. The court finds in Oxford Mall's arguments no compelling reasons to further reduce the fee award. And the court will award J.C. Penney's costs of

$558.05. So the court will enter a contemporaneous order awarding sanctions in the ***total amount of $63,114.05*** for J.C. Penney's attorney's fees and costs in this case from March 5, 2020 to August 5, 2021.

And the court will GRANT Oxford Mall's request to file into this case's record J.C. Penney's summary judgment filing from the state court case and the state court's ruling on that motion. (Docs. 151, 153).

**DONE** and **ORDERED** this 30th day of June, 2022.

_____
**KARON OWEN BOWDRE**
UNITED STATES DISTRICT JUDGE